### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JMG VENTURES LLC, | § | |
| | § | |
| Plaintiff, | § | Case No. |
| | § | |
| v. | § | |
| | § | |
| | § | |
| MICROSOFT CORPORATION, | § | JURY TRIAL DEMANDED |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |
| | § | |

### ORIGINAL COMPLAINT AND JURY DEMAND

Plaintiff JMG VENTURES LLC files this Complaint for patent infringement against Defendant MICROSOFT CORPORATION, alleging as follows:

## I.    THE PARTIES

1.    JMG VENTURES LLC ("Plaintiff" or "JMG") is a limited liability company organized and existing under the laws of the State of Massachusetts, with a principal place of business at 485 Concord Street, Holliston, Massachusetts 01746.

2.    Defendant MICROSOFT CORPORATION ("Defendant" or "Microsoft") is a corporation organized under the laws of the state of Washington, having its principal place of business at One Microsoft Way, Redmond, Washington 98053. Microsoft may be served with process by serving its registered agent, Corporation Service Company at 84 State Street, Boston, Massachusetts 02109.

1

## II.    JURISDICTION AND VENUE

3.    This is an action for infringement of United States patents under 35 U.S.C. §§ 271, *et seq.* Federal question jurisdiction is conferred to this Court over patent infringement actions under 28 U.S.C. §§ 1331 and 1338(a).

4.    This United States District Court for the District of Massachusetts has general and specific personal jurisdiction over Microsoft because Microsoft, directly and/or through intermediaries, has committed acts within the District giving rise to this action, and is present in and transacts and conducts business in this District.

5.    Personal jurisdiction exists over Microsoft because Microsoft has purposefully established minimum contacts with this forum as a result of business regularly conducted within the Commonwealth of Massachusetts and within this District, such that the assertion of personal jurisdiction would comport with fair play and substantial justice, including, on information and belief, as a result of, at least, developing, marketing, and selling its products, including the Accused Products, within Massachusetts and this District.

6.    Microsoft is further subject to personal jurisdiction in this Court because, *inter alia*, Microsoft regularly solicits and transacts business in this District and has an established place of business in this District. Accordingly, this Court's jurisdiction over Defendant comports with the constitutional standards of fair play and substantial justice and arises directly from Defendant's purposeful minimum contacts with the Commonwealth of Massachusetts and this District.

7.    Microsoft maintains regular and established places of business within this District, including its New England Research & Development (NERD) Center located at

2

1 Memorial Drive, Cambridge, Massachusetts[1], and its "New England Sales, Marketing and Services Group (SMSG)" located at 5 & 15 Wayside Burlington, Massachusetts.[2] Microsoft develops and/or sells its products, including the Accused Products described herein, in this District.

8.    Microsoft has sufficient minimum contacts with this District such that this venue is fair and reasonable. Through its XBOX Division (f/k/a Microsoft Gaming Division), Microsoft has committed such purposeful acts and/or transactions in this District that it reasonably should know and expect that they could be hailed into this Court as a consequence of such activity, including at least locating multiple regular and established physical office locations in this District.  Microsoft has transacted and, at the time of the filing of this Complaint, continues to transact business within this District, to include at least its marketing and selling of its Xbox gaming system products, both directly and indirectly, for use by customers residing in this District.

9.    Further, upon information and belief, Microsoft makes or sells products that are and have been used, offered for sale, sold, and/or purchased in this District. Microsoft, either directly or through its distribution network, places infringing products or systems within the stream of commerce, which stream is directed at this District, with the knowledge and/or understanding that those products will be sold and/or used in this District.

---

[1] *See,* https://blogs.microsoft.com/newengland/2017/09/28/nerd10-transformation-in-kendall-square-nerd-and-microsoft-over-the-past-10-years/; and,
https://microsoftnewengland.com/contact
[2] *See,* https://blogs.microsoft.com/newengland/2016/01/20/microsofts-new-england-smsg-organization-moving-to-burlington/

10.     For these reasons, personal jurisdiction exists, and venue is proper in this Court under 28 U.S.C. §§ 1391(b) and (c) and 28 U.S.C. § 1400(b), respectively.

### III.     Inventor Jon Glickman and the Patents-in-Suit

11.     Plaintiff JMG is the owner of all rights and title in and to U.S. Patents Nos. 9,471,519 ("the '519 Patent"), which issued on October 18, 2016, entitled "Computer System and a Computer Device;" and, U.S. Patent No. 11,775,464 ("the '464 Patent"), which issued on October 3, 2023, also entitled "Computer System and a Computer Device," among others. The '464 Patent is attached hereto as Exhibit A. The '519 Patent is attached hereto as Exhibit B. Collectively the '519 and '464 Patents are referred to herein as the "JMG Patents" or the "Patents-in-Suit."

12.     The Patents-in-Suit claim priority through a series of related patents and patent applications back to an earliest effective filing date of May 1, 2013. Exh. A at 2 (Related U.S. Application Data); Exh. B at 1 (Related U.S. Application Data).

13.     The inventions disclosed and claimed in the JMG Patents were developed by their lone inventor, Mr. Jonathan Glickman ("Glickman"). The JMG Patents were assigned by Glickman to JMG, with such assignment recorded with the U.S. Patent and Trademark Office on May 14, 2026 at reel/frame 074656/0897.[3] This assignment is effective to convey all rights in and title to the JMG Patents to JMG, including the right to sue for infringement of the Patents-in-Suit and collect all damages available under law thereof.

14.     Glickman earned a Bachelor of Engineering degree from Northeastern University in Electrical and Computer Engineering. Throughout the decades since,

---

[3] Each such assignment is available through the USPTO searchable online assignments database at URL: https://assignment.uspto.gov/patent/index.html#/patent/search.

Glickman has worked extensively in the field of data warehousing. His professional experience includes involvement in many data warehousing projects in prominent senior database architect and senior data engineering roles. Glickman's work experience, his continuous curiosity and study of emerging technologies in the art, and his inventive nature led to his conception of many innovative solutions to problems faced in the industry relating to computer architecture, data storage and retrieval, processing bottlenecks, and the like. Glickman's penchant for recognizing technological shortcomings and developing innovative solutions led to the issuance of nine U.S. Patents, with additional applications currently pending before the USPTO, all of which name Glickman as the lone inventor.

15.    Among the nine patents awarded to Glickman are the Patents-in-Suit. They disclose innovative device and system hardware arrangements and component functionality to circumvent bottlenecks that would otherwise limit performance, among other innovations. Glickman recognized that "[t]raditionally disk access has been more of a bottleneck problem than a network switch" in distributed computing environments and that improvements to solid state drivers (SSDs) rendered them suitable for incorporation within distributed computing systems to improve overall operational speed. Exh. A at 1:60-2:5.

16.    Incorporation of SSDs within such systems required development of an unconventional component arrangement, however, for the operational speed improvement to be realized. *Id.* Specifically, the Patents-in-Suit disclose that use of SSDs in the conventional architecture, which grouped mechanical hard drives and kept them "separate[] from CPUs and memory that resided on a motherboard," would be

ineffective. *Id.* at 1:55-60. Under the conventional arrangement, the operation of the communication medium used to access the SSDs becomes the limiter that prevents full realization of operational speed improvements achievable. *Id.* at 1:55-2:5.

17.    The Patents-in-Suit disclose arranging system components in an unconventional manner by no longer segregating disk drive components and functionality from motherboard components. The motherboard components and communication bus over which they communicate are reconfigured to permit direct access between motherboard components and storage. *Id.* at 2:26-38; 2:45-50.

18.    The Patents-in-Suit also disclose embodiments in which motherboard components operate in a manner similar to individual minicomputers. These components are configured to perform memory and CPU functions, whereby they are capable of acquiring, processing, and passing data directly to other components without having involvement of main system memory and/or a main CPU. Exh. A at 3:23-47. These improvements reduce system complexity and eliminate limitations on processing speed caused by overreliance on the main CPU and by "latency of the internal hardware." *Id.* at 2:42-50; 5:43-56; 5:65-6:5.

19.    Put another way, the Patents-in-Suit teach that continual and inevitable hardware *component* improvements were, standing alone, insufficient to provide optimal improvement to *system* performance. To achieve the best results, use of traditional arrangements oriented around *centralized* processing and storage architecture needed to be replaced with new component arrangements applying new processing and storage architecture. *Id.* at 2:51-3:8. The specification teaches:

The present invention relates generally to an inventive form of computer architecture that facilitates a completely modular design that is flexible enough to be applied to most tasks to improve performance in a cost effective manner. This flexible design of the present invention encompasses the use of identical Sibling boards arranged in either a series or parallel arrangement by the manner that they are provisioned in the system. By organizing together on the Sibling board the fastest components of what typically comprises a traditional motherboard, they can communicate with each other through a common bidirectional bus in an uninhibited manner, which allows access to storage fluidly. Distributed systems, clustering and similar technologies have relied on a physical network switch to accomplish in one particular embodiment of the invention what the Sibling board can

provide entirely in I/O components by implementing a common bus for high speed throughput to storage while placing the traditional bus controller type devices that function at slower speeds on an I/O controller hub on a common bus for external access. The Sibling boards have no requirement for a traditional motherboard, daughterboard to operate in an independent manner.

*Id.* at 3:53-4:7 (annotations added); *see, also Id.* at 4:25-39.

20.     The Patents-in-Suit disclose several alternative embodiments that may be implemented to realize desired functionality. For example, the specification discloses embodiments implementing series, parallel, and combined component configurations to selectively customize the resulting system for performance of prefetching and distributed processing, as desired:

an optional device. Sibling boards **30**, **40**, **50**, and **60** attached in a serial configuration can be arranged for prefetching. By embedding application code on each level, it can allow the processing of many stages of prefetching. Sibling boards **30**, **40**, **50**, and **60** attached in a parallel configuration can distribute processing across them simultaneously in a distributed manner. Thus, according to the present invention, customized combinations can be implemented to tune the Sibling Board computer appliance to any application, whereas currently available computer appliances are not as flexible.

*Id.* at 6:51-60 (annotations added); Figs. 2-4, 7.

21.    The specification teaches exemplary systems that may comprise a split-board configuration. *Id.* at 7:45-65; 9:46-10:4. According to this embodiment, component units may be grouped to segregate components comprising an input/output controller hub from grouped components that operate at faster speeds. This arrangement accommodates uninhibited, rapid, and direct communication among the grouped components capable of faster operation, which may include CPUs, memory, GPUs, SSDs, among others, via bus connections. *Id.* at 5:49-58; 8:35-9:7; 10:46-52; Fig. 7. Communications for interfacing faster operating components with "slower periphery devices like keyboards, mouse, serial connector and video" or with "an Ethernet device, which can be a router, switch, a wireless interface" or the like are routed through the input/output controller hub. *Id.*

22.    Some or all of the respective components making up the two component groupings depicted in the split-board embodiment of Fig. 7 may reside on a single CPU system-on-a-chip. *Id.* at 7:66-8:4; 8:9-11; 9:1-7; 13:40-45.

23.    The novel system architecture and design disclosed and claimed in the Patents-in-Suit have been widely adopted. The advantages realized through practice of the inventions claimed in the Patents-in-Suit are particularly well-suited for use with gaming systems. Practice of the inventions conceived by Glickman and claimed in the

8

Patents-in-Suit accommodate prefetching operations and distributed processing at operational speeds and sufficient scale necessary to meet user demand for fast game loading speeds, minimized wait times and lag, uninterrupted streaming, instant decompression, enhanced texture resolution, and other performance attributes.

24.    State-of-the-art gaming systems released within the past decade including the Xbox Series S and Xbox Series S consoles made and sold by Microsoft, implement Glickman's innovative system architecture. These consoles were first released in November 2020, more than seven years after the priority date of the Patents-in-Suit and three years after issuance of the '519 Patent.

**IV. Microsoft and the Accused Products**

25.    Microsoft offers for sale and sells Xbox game consoles and related products and services directly to its customers through its website[4]. Microsoft offers and sells each of the following models of its Xbox Series S and Series X consoles via its website: Series S – 1TB; Series S – 512GB; Series X – 2TB Galaxy Black Special Edition; Series X – 2TB; Series X 1TB; and, Series X – 1TB Digital Edition. These models are identified collectively herein as the Accused Products.

---

[4] https://www.xbox.com/en-US/consoles/all-consoles#shop





26.     The Accused Products are gaming consoles operable by users to play video games. The differences among the models of Accused Products relate primarily to their respective internal storage capacity and/or coloring of the console housing.

27.     Through its website, Microsoft also sells games, "Game Pass" subscriptions, and downloadable content directly to users of the Accused Products.



28.      Microsoft also sells accessories including controllers, headsets, console stands, chargers, and the like directly to end users of the Accused Products through its website:[5]



29.      The foregoing gaming products and accessories are specifically designed for use with the Accused Products in connection with gameplay by users of the Accused Products. Further, these gaming products[6] and accessories are compatible for use only with the Accused Products.

30.      In addition to its direct sales to customers via its website, Microsoft sells its Accused Products, gaming products, and accessories through third-party distributors

---

[5] https://www.xbox.com/en-us/accessories?xr=shellnav
[6] https://www.xbox.com/en-US/games/optimized

and retailers. Microsoft's website identifies and provides links to customers for each of these channels through which Microsoft sells and distributes its products[7]:



31.     With respect to the infringement analysis presented herein, each of the Accused Products comprise substantially identical features, components, functionality, and operation. More specifically, each of the Accused Products utilize "Velocity Architecture" for game play.[8]

32.     The Accused Products comprise the fourth generation of Xbox gaming systems that were first offered for sale in the U.S. in November 2020. The predecessor generation included versions designated as Xbox One. Models of Xbox One were released between November 2013 (Xbox One) and November 2017 (Xbox One X).

33.     Significant differences exist between the Accused Products and the predecessor Xbox One generation of consoles. The most important differences directly

---

[7] https://www.xbox.com/en-us/where-to-buy
[8] https://www.xbox.com/en-US/consoles/compare

attributable to the impressive leap in performance achieved by the Accused Products relate to adoption of Velocity Architecture used for accessing and loading stored data.

34.     The Xbox One generation relied on conventional mechanical hard drives for data storage. Mechanical drives must physically move a read head to different locations on a disk, so retrieving thousands of small, scattered game assets from memory for gameplay results in substantial latency. Latency results in long load times and the need for "load screen" pauses in gameplay. To minimize the effect during gameplay, the Xbox One needed to anticipate which memory assets were needed, load them into RAM early, and retain them in RAM. This limited game development and slowed gameplay because the CPU resources were continuously consumed with accessing memory and managing RAM storage.

35.     The Xbox One generation applied a traditional approach for data access and retrieval for gameplay that required significant CPU involvement throughout. Under this approach, the CPU initiated requests for stored game assets to HDD and was responsible for I/O processing and decompressing data received from the HDD. The CPU then placed the game assets in RAM for subsequent retrieval by the GPU. This constant involvement of the CPU limited the available system processing power for other tasks while also complicating the data flow path, compounding latency problems.

36.     The latency issues limiting performance of the Xbox One generation of game consoles did not carry forward to the Accused Products due to the adoption of "Velocity Architecture."[9] Xbox Velocity Architecture is the storage and asset-streaming system used by the Accused Products. Velocity Architecture encompasses four primary

---

[9] https://news.xbox.com/en-us/2020/07/14/a-closer-look-at-xbox-velocity-architecture/

changes to the components and data flow, including: (1) use of custom NVMe SSDs for storage; (2) DirectStorage input/output API; (3) dedicated hardware decompression; and (4) Sampler Feedback Streaming.[10] Together, these improvements change how game data moves from permanent storage into system memory and ultimately reaches the GPU.

37.    Velocity Architecture utilizes SSDs (NVMe SSDs) in place of mechanical drives.[11] The NVMe SSDs used have no moving parts and are optimized for consistent sustained performance.

38.    To further optimize the gain in operational speed from replacing HDDs with SSDs, Velocity Architecture implements "DirectStorage API." DirectStorage is the software/API and I/O architecture used to schedule and manage transfers of data from the SDD to the GPU.[12] DirectStorage API "take[s] full advantage of the raw [input/output] performance afforded by the hardware, resulting in virtually eliminating load times."[13] The DirectStorage API is designed for use with "the latest hardware advancements with SSD technology." A fast SSD alone does not solve the bottleneck problem if the operating system and game must submit large numbers of storage requests through an interface designed for slow disks. DirectStorage lets games submit many I/O requests between the GPU and SSD efficiently, maintain multiple request queues, assign priorities to requests, reduce per-request CPU overhead, and coordinate SSD access and hardware decompression.

---

[10] https://news.xbox.com/en-us/2020/07/14/a-closer-look-at-xbox-velocity-architecture/

[11] https://www.tomshardware.com/news/microsoft-xbox-series-x-architecture-deep-dive

[12] https://learn.microsoft.com/en-us/gaming/gdk/docs/features/console/storage/directstorage/directstorage-overview?view=gdk-2604

[13] https://news.xbox.com/en-us/2020/07/14/a-closer-look-at-xbox-velocity-architecture/

39.     Game files stored in memory are typically stored in compressed form to reduce installation size and storage bandwidth. These files must be decompressed as part of the retrieval process before they can be used by the GPU. While predecessor consoles relied on the CPU for decompression, Velocity Architecture uses dedicated decompression hardware for this task.

40.     The SSD, decompression block and DirectStorage substantially reduce the time required to retrieve and prepare assets. As a result, latency is greatly reduced and previously necessary load screens are much shorter in duration. Microsoft boasts of achieving 2.4 GB/s of raw storage throughput using Velocity Architecture. Microsoft characterized this as being more than 40 times the raw I/O throughput and roughly 100 times the effective I/O performance of the Xbox One generation.[14] Microsoft also attributes the ability of the Accused Products to provide enhanced features including "Quick Resume, lightning-fast load times, and gameplay of up to 120 FPS" to its Velocity Architecture[15].

41.     Together, these Velocity Architecture improvements change how game data moves from permanent storage into system memory and ultimately reaches the GPU. Whereas Xbox One stored a relatively large working set in RAM because retrieving new data was slow, using Velocity Architecture the Accused Products rapidly retrieve, decompress, prioritize and selectively load assets as they are needed. The result is an

---

[14] https://news.xbox.com/en-us/2020/07/14/a-closer-look-at-xbox-velocity-architecture/

[15] https://www.xbox.com/en-US/consoles/xbox-series-x;
https://www.xbox.com/en-US/consoles/xbox-series-s

architectural distinction—a fundamentally different relationship among storage, memory, CPU and GPU.[16]

42.    The physical components of the Accused Products include a custom AMD SOC comprising a CPU, GPU, DRAM, a Media Hub, a System Hub, and an I/O Hub interfacing an 8-channel PCIe Gen4 bus, among other functional component groups.[17] Microsoft provides the following block diagram showing functional component groups and communication paths resident on the SOC:



43.    The Accused Products comprise a custom eight-core AMD Zen 2 CPU.[18] Each Zen 2 core has a private L2 cache and shared access to one of two 4Mb L3 caches.[19] Each Zen 2 core comprises circuitry controlling its access to core memory.

---

[16] https://www.youtube.com/watch?v=n0sMmt-rSzQ

[17] chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://hc32.hotchips.org/assets/program/conference/day1/HotChips2020_GPU_Microsoft_Jeff_Andrews_v2.pdf

[18] https://docs.amd.com/r/en-US/57368-uProf-user-guide/uProf-User-Guide

[19] https://redgamingtech.com/xbox-series-x-hot-chips-analysis-part-1-gpu-cpu-overview/

44.     AMD's Zen 2 performance documentation identifies load/store operations, L1 and L2 data-cache accesses, hardware prefetching, instruction and data TLBs, and page-table walking as core-level memory-system functions. The CPU can operate with simultaneous multithreading (SMT) enabled during which the eight physical cores can execute sixteen hardware threads.[20]

45.     Within the Xbox Velocity Architecture, the Zen 2 CPU principally coordinates game execution and storage operations rather than performing the high-throughput data movement and decompression itself. Through DirectStorage, software running on the CPU can establish I/O queues, prioritize requests, and initiate retrieval of game assets from the NVMe SSD with substantially reduced processor overhead.



---

[20] https://redgamingtech.com/xbox-series-x-hot-chips-analysis-part-1-gpu-cpu-overview/

46.     The Accused Products comprise a custom AMD graphics processing unit based on the RDNA 2 architecture. The GPU contains 52 Compute Units (CUs) that provide approximately 12 teraflops of computational performance.[21]



47.     Each CU is a programmable execution engine containing arithmetic/logic pipelines, schedulers, registers, and other instruction-execution circuitry. They are the fundamental programmable execution engines of its GPUs. Each CU also includes local memory resources, including registers and Local Data Share (LDS), an on-CU scratchpad memory used by work executing on that CU. Each CU contains circuitry that controls its access to memory. AMD identifies vector-memory and scalar-memory units that issue loads, stores, and other memory operations, as well as load/store circuitry that transfers data between compute units and the broader GPU memory subsystem.[22]

---

[21] https://redgamingtech.com/xbox-series-x-hot-chips-analysis-part-1-gpu-cpu-overview/

[22] https://docs.amd.com/v/u/en-US/rdna2-shader-instruction-set-architecture

48.    Internally, the CUs provide the programmable parallel-processing resources that execute shader and compute workloads, among other tasks. Each CU contains programmable execution circuitry and associated local storage/cache resources permitting execution of many concurrent processing threads. The CUs operate through the GPU cache and memory hierarchy and access shared GDDR6 memory. This parallelized arrangement permits different rendering and compute workloads to be distributed among numerous CUs at the same time, rather than being executed serially by a single general-purpose processor.[23]



Figure 1. AMD RDNA Generation Series Block Diagram

49.    The GPU performs an important role in Velocity Architecture's asset-streaming system, particularly through Sampler Feedback Streaming (SFS). SFS allows the GPU to identify the portions of texture mipmaps that are actually required for

---

[23] https://docs.amd.com/v/u/en-US/rdna2-shader-instruction-set-architecture

rendering, so the system can load those portions from storage when needed. The GPU and its CUs execute the workloads that consume these streamed assets.[24]

50.     The Accused Products comprise a custom 1 TB NVMe SSD as the foundation of Xbox Velocity Architecture. The SSD communicates with the I/O Hub of the SOC using NVMe over PCI Express, giving the system a much lower-latency and higher-bandwidth storage path than the mechanical hard drives used in prior Xbox consoles.[25]



51.     The NVMe SSD comprises an SSD controller ASIC incorporating a processor that executes firmware to process NVMe commands, perform address translation, schedule reads and writes, and manage the storage medium.[26] The NVMe

---

[24] https://redgamingtech.com/xbox-series-x-hot-chips-analysis-part-1-gpu-cpu-overview/

[25] https://www.tweaktown.com/news/76132/xbox-series-xs-wd-sn530-ssd-has-custom-asic-to-support-pcie-4-0/index.html

[26] https://www.tweaktown.com/news/76132/xbox-series-xs-wd-sn530-ssd-has-custom-asic-to-support-pcie-4-0/index.html

SSD components include a PCIe host interface, an SSD Controller (e.g. Processor with Firmware) and nonvolatile memory such as NAND.[27]

| Controller | |
|---|---|
| Manufacturer: | WD |
| Name: | 20-82-10048-A1 Polaris MP16 Find More Drives |
| Architecture: | ARM 32-bit Cortex-R |
| Foundry: | TSMC FinFET |
| Process: | 16 nm |
| Flash Channels: | 4 @ 1,200 MT/s |
| Chip Enables: | 4 |
| Controller Features | HMB (enabled) |

| NAND Flash | |
|---|---|
| Manufacturer: | Toshiba |
| Name: | BiCS4 |
| Rebranded: | 60662 1T00 (Rebranded as SanDisk) |
| Type: | TLC |
| Technology: | 96-layer |
| Speed: | 800 MT/s |
| Capacity: | 1 chip @ 8 Tbit |

52.     SSD memory is NAND flash, which nonvolatily stores game data. The controller also incorporates memory-control circuitry that translates host requests into operations on the NAND, determines where data is stored, maintains the flash-translation-layer mapping, and controls reads, programming, erasure, error correction, wear leveling, and related NAND-management operations.

53.     Within the Accused Products, the SSD operates as part of a hardware pipeline. DirectStorage submits and manages storage requests to the NVMe device. This arrangement permits the NVMe drive and the dedicated decryption/decompression to operate in parallel as a pipeline.

54.     Functionally, the SSD enables Velocity Architecture to treat game storage as a rapidly accessible source of assets that can be streamed into memory close to the

---

[27] https://news.xbox.com/en-us/2020/07/14/a-closer-look-at-xbox-velocity-architecture/;

time they are needed. Rather than requiring a game to preload and retain large quantities of texture and geometry data in RAM, DirectStorage and Sampler Feedback Streaming allow the system to request selected assets or portions of textures from the SSD as gameplay proceeds. This architecture reduces loading latency and permits storage to participate much more directly in the CPU/GPU asset-delivery pipeline.

55.     As shown in the block diagram above, the Zen 2 CPU and RDNA 2 GPU are integrated into the same custom SoC and communicate through the internal interconnect fabric of the SOC and through a shared memory subsystem. The internal interconnect fabric of the SOC directly accesses a PCIe bus through its I/O Hub to the NVMe subsystem. The PCIe bus extends the internal interconnect fabric of the SOC to reach SSD components for direct communications therebetween.

56.     Velocity Architecture utilizes the hardware, APIs, and communication paths described herein to provide stored memory to the GPU for game play in the following manner. The CPU initiates and manages asset requests using DirectStorage. Read requests are routed via DirectStorage queues into the I/O pipeline. From there, dedicated hardware can decrypt and decompress the data, with the SSD and decompression hardware operating in parallel as a pipeline. DirectStorage maps the game-provided destination buffer through the pipeline so the hardware can write the resulting asset data directly into the shared GDDR6 memory for use by the GPU for render or compute tasks. The creation of unnecessary intermediate copies and the need

for routing of data to the CPU for processing are avoided.[28] This process is shown graphically below:



57.     This data flow scheme is used to perform prefetching operations. For prefetching, game and/or application software executing on one or more cores comprising the Zen 2 CPU determine which assets are needed and uses DirectStorage to enqueue and prioritize storage requests. The NVMe SSD receives the queued storage requests and retrieves the identified asset data through execution of storage-controller firmware. The decompression block processes retrieved compressed data and writes the resulting asset data toward the title-provided memory buffer, while shared GDDR6 memory holds the prefetched assets for CPU/GPU use. One or more CUs of the GPU execute application kernels to provide Sampler Feedback Streaming, allowing the application to determine what texture data should be loaded next.[29]

---

[28] https://www.tomshardware.com/features/the-directstorage-advantage-phison-io-ssd-firmware-preview

[29] https://developer.nvidia.com/blog/cuda-graphs/;

https://docs.amd.com/v/u/en-US/rdna2-shader-instruction-set-architecture;

https://docs.amd.com/r/en-US/57368-uProf-user-guide/uProf-User-Guide;

58.    The Accused Products implement a "split-motherboard" layout, in which the console electronics are distributed across separate circuit-board assemblies rather than placed on a single large planar motherboard.[30] The custom SoC containing the Zen 2 CPU and RDNA 2 GPU remains the principal compute device. A southbridge-type I/O controller functions as the communications hub between the primary compute subsystem and lower-speed or peripheral devices. These peripheral interfaces, including USB, Ethernet, wireless-accessory connectivity, HDMI, storage, and an optical drive. Commands and data originating at the CPU/SoC are routed through the system interconnect to the I/O-controller circuitry, which manages communications with attached peripheral interfaces rather than requiring the CPU or GPU to implement each peripheral protocol directly.

59.    The Velocity Architecture and associated functionality described herein were not present in the third-generation Xbox products released as late as November 2017. They first appeared in the Accused Products released in November, 2020. This timeline coincides with Microsoft learning of the innovative solutions developed by Glickman and disclosed in a related patent to the Patents-in-Suit in early 2019 – approximately 18 months before release of the Accused Products.

60.    In early 2019, Microsoft was provided with a copy of one of Glickman's patents having an identical specification to the Patents-in-Suit. Microsoft was encouraged to discuss how the component architecture conceived by Glickman could be incorporated

---

https://learn.microsoft.com/en-us/gaming/gdk/docs/features/console/storage/directstorage/directstorage-overview?view=gdk-2604

[30] https://www.digitalfoundry.net/articles/digitalfoundry-2020-constructing-xbox-series-x-a-revolution-in-console-design

into the next generation of the Xbox. Licensing discussions were held over the next year but an agreement was never reached.

61.    By virtue of at least these direct interactions between the parties, Microsoft has had actual knowledge of Glickman's patents and their direct relevance to the technology incorporated into the Accused Products since before the initial release of the Accused Products. Despite this specific knowledge, Microsoft proceeded with sales of the Accused Products in willful infringement of the Patents-in-Suit, as it still does today.

**COUNT I**
**PATENT INFRINGEMENT**
**U.S. Patent No. 11,775,464**

62.    JMG repeats and re-alleges all preceding paragraphs of this Complaint, as though fully set forth herein.

63.    On October 3, 2023, U.S. Patent No. 11,775,464 ("the '464 Patent") entitled "Computer System and a Computer Device" was duly and legally issued. As of the filing of this Complaint, the '464 Patent remains in full effect.  A true and correct copy of the '464 Patent is attached hereto as Exhibit A and made a part hereof.

64.    JMG is the owner of all rights in and title to the '464 Patent, including all rights to enforce and prosecute action for infringement of the '464 Patent and to collect damages for all relevant times against infringers of the '464 Patent.  Accordingly, JMG possesses the exclusive right and standing to prosecute the present action for infringement of the '464 Patent by Microsoft.

65.    Independent Claim 1 of the '464 Patent, and each dependent claim depending therefrom, are directed to a "computer gaming system." Exh. A at 14:36-15:2

(Claim 1). The gaming system claimed comprises a bus, a hub portion comprising an input/output controller for communicating with periphery device(s), and a main board comprising one or more component units that are capable of direct communication with one or more other component units over the bus and is capable of communicating with the hub portion over the bus. Each component unit comprises a central processing unit (CPU), a memory controller, and a memory.  Each component unit may operate as a CPU system-on-a-chip (CPU/SOC), a graphical processing unit (GPU), a network component, a solid state drive (SSD), or an application component. An embedded application compute kernel is used to prefetch data using one or more component units that are coupled in series. Each component unit is capable of hosting an operating system on a dedicated physical resource.

66.    Independent Claim 7 of the '464 Patent, and each dependent claim depending therefrom, are directed to a "computer gaming system." Exh. A at 14:36-15:2 (Claim 7). The gaming system claimed comprises a bus, a hub portion comprising an input/output controller for communicating with periphery device(s), and a main board comprising one or more component units that are capable of direct communication with one or more other component units over the bus and is capable of communicating with the hub portion over the bus. Each component unit comprises a central processing unit (CPU), a memory controller, and a memory.  Each component unit may operate as a CPU system-on-a-chip (CPU/SOC), a graphical processing unit (GPU), a network component, a solid state drive (SSD), or an application component. An embedded application compute kernel is used to prefetch data using one or more component units that are

coupled in parallel. Each component unit is capable of hosting an operating system on a dedicated physical resource.

67.     Microsoft, without authority, consent, right, or license, and in direct infringement of at least Claim 1 and/or Claim 7 of the '464 Patent, makes, has made, uses, has sold, and sells the Accused Products comprising its Xbox Series S and Xbox Series X gaming consoles. Each such act directly infringes at least Claim 1 and/or Claim 7 of the '464 Patent, as detailed in the preceding sections.

68.     As explained in detail in the preceding sections, each of the Accused Products is a computer gaming system having a motherboard architecture comprising a custom SoC containing Zen 2 CPU cores and RDNA 2 GPU Compute Units, together with an NVMe SSD and I/O circuitry communicating through system interconnects and PCIe. The internal system interconnect fabric and PCIe bus extension enable communication amongst these components, and with a "southbridge" I/O hub for communications with periphery devices. The CPU cores, GPU CUs, and SSD/controller structures each comprise processing, memory, and memory-control functionality. DirectStorage then coordinates those resources to retrieve game assets from the SSD, stage and decompress the data, and deliver it to shared memory for CPU/GPU use. Accordingly, the Accused Products directly infringe at least claim 1 and/or claim 7.

69.     JMG expressly reserves the right to assert direct infringement of additional claims of the '464 Patent by Microsoft relating to its making, using, and selling the Accused Products.

70.     JMG has been damaged by Microsoft's infringing conduct.  JMG is entitled to an award of damages in an amount that adequately compensates for such

infringement, which, by law, cannot be less than a reasonable royalty plus interest and costs under 35 U.S.C. § 284.

71.    Microsoft's infringement of the '464 Patent has been willful. Upon information and belief, Microsoft has had actual knowledge and/or constructive notice of the existence of the '464 Patent since at least October 23, 2023, the date of issuance of the '464 Patent. Based upon, at least, prior correspondence and licensing discussions between Glickman and Microsoft beginning in early 2019 and spanning nearly a year, Microsoft had actual knowledge of Glickman's patents sharing an identical specification to the '464 Patent. Thereafter, upon information and belief, Microsoft continued to actively monitor the patents and patent applications of Glickman within the same patent family, including the '464 Patent. All infringement by Microsoft since the issuance of the '464 Patent has been undertaken with the specific knowledge or reckless blindness that such acts constitute direct infringement of the '464 Patent. JMG is additionally entitled to enhanced damages under 35 U.S.C. § 284 for all such acts of infringement.

## COUNT II
## PATENT INFRINGEMENT
## U.S. Patent No. 9,471,519

72.    JMG repeats and re-alleges all preceding paragraphs of this Complaint, as though fully set forth herein.

73.    On October 18, 2016, U.S. Patent No. 9,471,519 ("the '519 Patent") entitled "Computer System and a Computer DevJMG" was duly and legally issued. As of the filing of this Complaint, the '519 Patent remains in effect.  A true and correct copy of the '519 Patent is attached hereto as Exhibit B and made a part hereof.

28

74.     JMG is the owner of all rights in and title to the '519 Patent, including all rights to enforce and prosecute action for infringement of the '519 Patent and to collect damages for all relevant times against infringers of the '519 Patent.  Accordingly, JMG possesses the exclusive right and standing to prosecute the present action for infringement of the '519 Patent by Microsoft.

75.     Independent Claim 1 of the '519 Patent and each dependent claim depending therefrom are directed to a multi-node computer architecture implemented within an IC, where multiple configurable processing units share a common bus and I/O hub, can communicate with one another and host operating-system functionality, and can operate together in series as a disk controller that uses embedded application software to perform staged data prefetching.

76.     Independent Claim 9 of the '519 Patent and each dependent claim depending therefrom are directed to a multi-node computer architecture implemented within an IC, where multiple configurable processing units share a common bus and I/O hub, can communicate with one another and host operating-system functionality, and can operate together in parallel as a disk controller that uses embedded application software to perform staged data prefetching.

77.     Microsoft, without authority, consent, right, or license, and in direct infringement of at least Claim 1 and/or Claim 9 of the '519 Patent, makes, has made, uses, has sole, and sells the Accused Products comprising its Xbox Series S and Xbox Series X gaming consoles which infringe at least Claim 1 and/or Claim 9 of the '519 Patent, among others, as described in the preceding paragraphs of this Complaint.

29

78.     Specifically, the Accused Products are gaming systems comprising a custom SoC that integrates multiple processing and I/O functional units, including: Zen 2 CPU cores, RDNA 2 GPU Compute Units, memory/I/O circuitry, and specialized storage-processing hardware. Each communicates through the SoC's internal interconnect and are operable in parallel to identify, access, and retrieve game assets from memory. Communication between these units is provided over the SoC system interconnect fabric, which also accesses I/O-controller circuitry of a hub portion for communication with periphery devices. The DirectStorage/Velocity Architecture storage pipeline accommodates prefetching: game software submits storage requests, the NVMe SSD retrieves the requested assets, and dedicated hardware performs decompression and stages the resulting data for use by the CPU and GPU. DirectStorage employs storage requests, a buffer, and hardware decompression, with multiple requests capable of being processed concurrently.

79.     JMG expressly reserves the right to assert direct infringement of additional claims of the '519 Patent against Microsoft relating to its making, using, and selling of the Accused Products.

80.     JMG has been damaged by Microsoft's infringing conduct. JMG is entitled to an award of damages in an amount that adequately compensates for such infringement, which, by law, cannot be less than a reasonable royalty plus interest and costs under 35 U.S.C. § 284.

81.     Microsoft's infringement of the '519 Patent has been willful. Upon information and belief, Microsoft has had actual knowledge of the existence of the '519 Patent since at least early 2019 based upon, at least, prior correspondence and licensing

30

discussions between Glickman and Microsoft beginning at that time. Microsoft was provided a copy of a related Glickman patent sharing an identical specification to the '519 Patent. Further, licensing discussions held over the following year included the '519 Patent. All sales of the Accused Products were made after Microsoft obtained actual knowledge of the '519 Patent, or with reckless blindness thereto, and the relevance of the innovations disclosed and claimed therein to the Accused Products. JMG is additionally entitled to enhanced damages under 35 U.S.C. § 284 for all such acts of infringement.

## VI.  JURY DEMAND

82.    Plaintiff hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court find in its favor and against Defendant, and that the Court grant Plaintiff the following relief:

a.    Judgment that one or more claims of the Patents-in-Suit have been directly infringed, either literally or under the doctrine of equivalents, by Defendant;

b.    Judgment that Defendant account for and pay to Plaintiff all damages to and costs incurred by Plaintiff because of Defendant's infringing activities and other conduct complained of herein, including enhanced damages as permitted by 35 U.S.C. § 284;

c.    Judgement that Defendant's infringement has been willful from the time Defendant was made aware of the infringing nature of its Accused

31

Products and that the Court award treble damages for the period of such willful infringement pursuant to 35 U.S.C. § 284;

d.   That Plaintiff be granted pre-judgment and post-judgment interest on the damages caused by Defendant's infringing activities and other conduct complained of herein;

d.   That the Court declare this an exceptional case and award Plaintiff its reasonable attorney's fees and costs in accordance with 35 U.S.C. § 285; and

e.   That Defendant, its officers, agents, servants and employees, and those persons in active concert and participation with any of them, be permanently enjoined from infringement of one or more claims of the Patents-in-Suit or, in the alternative, if the Court finds that an injunction is not warranted, Plaintiff requests an award of post judgment royalty to compensate for future infringement;

g.   That Plaintiff be granted such other and further relief as the Court may deem just and proper under the circumstances.

32

Dated: August 13, 2026

Respectfully submitted,


/s/ Brenda Flockhart-Shanks
Brenda Flockhart-Shanks
Massachusetts Bar No. 676600
Guy Yonay (pro hac vice to be filed)
New York Bar No. 2807337

PEARL COHEN LLP
Times Square Tower
7 Times Square
New York, NY 10036
(646) 878-0800
Fax : (646) 878-0801
131 Dartmouth Street
Boston, MA 02116, USA
(617) 228-5720
Fax : (617) 228-5721
bflockhart@pearlcohen.com
gyonay@pearlcohen.com

Jonathan T. Suder (*pro hac vice* to be filed)
Texas State Bar No. 19463350
Richard A. Wojcio, Jr. (*pro hac vice* to be filed)
Texas State Bar No. 24088667
Eric Farnsworth (*pro hac vice* to be filed)
Texas State Bar No. 24151609
FRIEDMAN, SUDER & COOKE
604 East 4th Street, Suite 201
Fort Worth, TX 76102
(817) 334-0400
Fax: (817) 334-0401
jts@fsclaw.com
wojcio@fsclaw.com
farnsworth@fsclaw.com

**ATTORNEYS FOR PLAINTIFF**

33